UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:05-cr-00166-BO-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | RESPONSE IN OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION FOR |
| | ) | EARLY TERMINATION OF |
| CHARLES BAREFOOT, | ) | SUPERVISED RELEASE |
| Defendant. | ) | |

NOW COMES the United States of America, by and through the United States Attorney for the Eastern District of North Carolina, and hereby files this response in opposition to Defendant's motions for early termination of supervised release. (D.E. 466, 467). The motions should be denied because Defendant has not demonstrated some new or unforeseen circumstance justifying early termination of supervision or that supervision would hinder rather than facilitate rehabilitation.

BACKGROUND

Acting on information supplied by a confidential informant to the Bureau of Alcohol, Tobacco and Firearms (the "ATF"), a deputy of the Johnston County, North Carolina Sheriff's Department stopped Defendant's van in traffic during the morning of July 19, 2002. The deputy searched the van with Defendant's consent, finding two loaded semiautomatic handguns beneath the driver's seat. United States v. Barefoot, 754 F.3d 226, 229-230 (4th Cir. 2014).

Not quite two hours later, the ATF executed a search warrant at Defendant's residence, where they discovered component materials for explosives, Ku Klux Klan

1

clothing and propaganda, and twenty-five firearms (predominantly shotguns and rifles) in proximity to more than four thousand rounds of ammunition. A concurrent search of the house where Defendant's son, Daniel, lived with several others, turned up two Kinestik binary explosive cartridges wrapped in newspaper and stored in a freezer. Daniel, eighteen years old and a Klansman in his father's group, told federal agents that Defendant had given him the explosives, which other residents referred to as "liquid dynamite." Barefoot, 754 F.3d at 230.

On August 20, 2002, Defendant was indicted in the Eastern District of North Carolina on a single count of possessing a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8). The predicate order was entered in state court in Johnston County after the presiding judge found that Defendant, on March 15, 2002, had held a 9mm pistol to the head of his wife, Sharon, and threatened to kill her. Defendant pleaded guilty to the federal indictment pursuant to an agreement with the Government. Id.

The district court accepted Defendant's guilty plea at a hearing on January 21, 2003, after which the debriefing mandated by the Plea Agreement took place. There, Defendant admitted having obtained the Kinestik cartridges in exchange for a hunting dog. Defendant also recounted a meeting with Glen Gautier, Michael Brewer, and Mark Denning. The men had convened at Defendant's home one evening during the late summer of 2001 to discuss a "problem" with Lawrence Petit, a fellow Klansman in coastal Carteret County, North Carolina, whom Brewer had branded an informant. Barefoot, 754 F.3d at 230-231.

2

Case 5:05-cr-00166-BO   Document 470   Filed 01/09/20   Page 2 of 9

After considerable deliberation, the group resolved to have Petit moved inland to Robeson County, or, failing that, to "get rid of him." Defendant permitted the others to use his van, and he lent Gautier two firearms. The trio returned a few hours later to inform Defendant that Denning had shot and killed Petit, with the corpse having been buried in a hayfield belonging to Gautier's brother. Gautier handed Petit's wallet to Defendant as proof of death; Defendant destroyed it with a blowtorch. At the time of Defendant's interview, Gautier and Denning had been arrested and charged with the murder, and Brewer was about to be. Barefoot, 754 F.3d at 2301.

Defendant unequivocally denied having made any bombs, and he omitted all mention of a series of incidents in October 2001, which began when Daniel and two Klan associates—Jonathan Avery and Jonathan Maynard—stole more than thirty firearms from an outbuilding. The three thieves took their haul to Defendant's residence, where Defendant, Sharon, and Gautier assisted in wiping down the weapons to remove any fingerprints. The next day, Defendant and Gautier transported some of the firearms to an area barn for safekeeping, and about ten or fifteen ultimately made their way to Brewer for sale on consignment. Id.

On June 18, 2003, the district court sentenced Defendant to 27 months in prison for his § 922(g)(8) conviction, granting him credit for time served since his July 2002 arrest. Upon his release from federal imprisonment on October 18, 2004, Defendant was charged and detained by state authorities in connection with the Petit murder. Id.

3

Case 5:05-cr-00166-BO   Document 470   Filed 01/09/20   Page 3 of 9

PROCEDURAL HISTORY

While in state custody, Defendant was again indicted by the grand jury in the Eastern District of North Carolina. The operative Superseding Indictment, filed August 2, 2006, charged Defendant in Count One with conspiracy to receive, possess, conceal, store, barter, sell, and dispose of stolen firearms, see 18 U.S.C. §§ 371, 922(j); in Count Two with the substantive § 922(j) offense; in Count Three with solicitation of another to assist in damaging and destroying by explosive the Johnston County Courthouse and Sheriff's Office, part of which was leased to the United States Department of Veterans Affairs, see id. §§ 373(a), 844(f)(1), 844(i); in Count Four with receiving an explosive (the Kinestik cartridges) with the intent that it be used to kill, injure, or intimidate other persons and to damage and destroy buildings, see id. § 844(d); in Count Five with a misdemeanor charge of improperly storing explosive materials, see id. §§ 842(j), 844(b); and in Count Six with distributing explosive materials to an individual (Daniel) under twenty-one years of age, see id. § 842(d)(1). Barefoot, 754 F.3d at 231.

On September 25, 2012, following a jury trial, Defendant was convicted of all counts in the Superseding Indictment. [D.E. 315, 316]. Following the Fourth Circuit's vacatur of Counts Five and Six, on July 16, 2014, Defendant was sentenced to a total of 180 months' imprisonment, 3 years' supervised release, and $400 special assessment. [D.E. 360]; see also Barefoot, 754 F.3d at 250-251. Defendant was released from imprisonment on December 5, 2017, and began his term of supervised

release. See (https://www.bop.gov/inmateloc/; Register Number 21191-056; last visited on January 8, 2020).

On December 26 and December 27, 2019, Defendant filed two identical motions for early termination of supervised release. (D.E. 466; 467). Defendant seeks relief on the grounds that he has been compliant with the terms of supervised release. Id.

ARGUMENT

Defendant's motion should be denied. Defendant fails to carry his burden that consideration of § 3553(a) factors should lead to his termination from supervised release. Section 3583(e) of Title 18, United States Code provides:

> The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), and (a)(7) –
>
> (1) terminate a term of supervised release and discharge the Defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the Defendant released and in the interest of justice;

18 U.S.C. § 3583(e). Considerations contained in § 3553 include, inter alia, the nature and circumstances of the offense and the history and characteristics of Defendant; the ability to afford adequate deterrence to criminal conduct; the need to protect the public from further crimes of Defendant. 18 U.S.C. § 3553(a). These consideration also include the need to provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Id.

While § 3553(a) provides a roadmap for the Court's consideration of Defendant's motion for early termination, courts have generally granted early termination only in cases involving some new or unforeseen circumstance, which may include exceptionally good behavior, or where supervision hinders rather than facilitates the defendant's rehabilitation. See, e.g., Folks v. United States, 733 F. Supp. 2d 649, 651–52 (M.D.N.C. 2010); United States v. Kay, 283 Fed. Appx. 944, 946–47 (3rd Cir. 2008); United States v. Atkin, 38 Fed. Appx. 196, 198 (6th Cir. 2002). Ultimately, however, the decision whether to terminate a term of supervised release is within the court's discretion. See United States v. Pregent, 190 F.3d 279, 283 (4th Cir. 1999) (noting that the phrase "the interest of justice" gives the district court latitude to consider a broad range of factors in addition to an individual's behavior in considering whether to terminate the supervised release period).

In this case, Defendant committed very serious firearm and explosives offenses and was appropriately sentenced to a lengthy term of imprisonment. The United States recognizes that Defendant has generally done well while on supervision[1] but that is obviously expected by the Court. Moreover, compliance with supervised release does not itself constitute the type of changed circumstances or "exceptionally good behavior" that justifies early termination because Defendant is expected to work and follow the rules while on supervised release. See Folks, 733 F. Supp. 2d at 652

---

[1] On January 8, 2020, United States Probation Officer Vann Freeman ("Freeman") informed the undersigned of the following:

Defendant has been compliant while on supervision and has met his requirements. However, given the violence associated with the offenses and the involvement of explosives, they would not recommend early termination.

("[a]lthough [the Defendant's] ongoing and full compliance with all conditions of supervised release, including payment of the fine and restitution, is commendable, in the end that is what is required to all criminal Defendants and is not a basis for early termination of his supervised release"); see also United States v. Caruso, 241 F. Supp. 2d 466, 469 (D.N.J. 2003) ("mere compliance with the terms of probation or supervised release is what is expected of probationers, and without more, is insufficient to justify early termination").

Defendant has not provided any evidence of specific job opportunities that are in jeopardy due to his supervised release term. Defendant has not presented any evidence that his behavior while on supervised release has been exceptional in any manner. Defendant has not presented any evidence that any rehabilitation efforts will be hindered in any manner by the supervised release term. Thus, while Defendant's compliance with his supervised release conditions is laudatory, it also reflects that his supervised release term appears sufficient but not greater than necessary to reflect the nature and circumstances of his criminal offenses, to deter criminal conduct, and to protect the public from further crimes. 18 U.S.C. § 3583(a). Consequently, based on both Defendant's lack of evidence and the factors promulgated in 18 U.S.C. §§ 3553(a), Defendant should remain on supervised release. See United States v. Medina, 17 F.Supp.2d 245, 247 (S.D.N.Y.1998) (noting that "[w]hile [defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule"); see also United States v. Johnson, 529 U.S.

53, 59 (2000)(Congress intended supervised release to assist individuals in their transition to community life, and thus supervised release fulfills rehabilitative ends, distinct from those served by incarceration.).

## CONCLUSION

For the reasons stated above, the Court should deny Defendant's motion for early termination of supervised release.

Respectfully submitted this 9th day of January, 2020.

                                  ROBERT J. HIGDON, JR.
                                  United States Attorney

                                  BY:  /s/ Rudy E. Renfer
                                  RUDY E. RENFER
                                  Attorney for the United States
                                  United States Attorney's Office
                                  Civil Division
                                  150 Fayetteville Street
                                  Suite 2100
                                  Raleigh, NC 27601
                                  Telephone: (919) 856-4530
                                  Fax: (919) 856-4487
                                  Email: rudy.e.renfer@usdoj.gov
                                  N.C. Bar No. 23513

<u>CERTIFICATE OF SERVICE</u>

      I do hereby certify that I have this 9th day of January, 2020, served a copy of the foregoing upon the below listed party electronically using the CM/ECF system or by placing a copy of the same in the U.S. Mail, addressed as follows:

Katherine E. Shea  
Federal Public Defender  
150 Fayetteville St. Mall  
Suite 450  
Raleigh, NC 27601-2919  
919-856-4236  
Fax: 919-856-4477  
Email: kat_shea@fd.org

      BY: /s/ Rudy E. Renfer  
      RUDY E. RENFER  
      Attorney for the United States  
      United States Attorney's Office  
      Civil Division  
      150 Fayetteville Street  
      Suite 2100  
      Raleigh, NC 27601  
      Telephone: (919) 856-4530  
      Fax: (919) 856-4487  
      Email: rudy.e.renfer@usdoj.gov  
      N.C. Bar No. 23513